1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JOSEPH N. D'AMICO, FORT DISCOVERY CORP., a Washington corporation, SECURITY SERVICES NORTHWEST, INC., a Washington corporation,<br><br>                    Plaintiffs,<br><br>        v.<br><br>JEFFERSON COUNTY, a Washington County, DAVID STANKO, ROBERT GEBO, KATHLEEN KLER, DAVID SULLIVAN, KATE DEAN, GREG BROTHERTON,<br><br>                    Defendants. | CASE NO. 20-5253 RJB<br><br>ORDER ON DEFENDANT ROBERT GEBO'S MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Defendant Robert Gebo's Motion for Summary Judgment (Dkt. 54) and his motion to strike (Dkt. 67). The Court has considered the pleadings filed regarding the motions and the file herein.

This case arises over a Plaintiff Joseph D'Amico and his companies' - Security Services Northwest, Inc. ("SSNW") and Fort Discovery Corp. - operation of a gun range in Jefferson

County, Washington on property commonly known as "Fort Discovery." Dkt. 1. Defendant Gebo, a special investigator with the Jefferson County Sherriff's Office, now moves for summary judgment dismissal of the claims asserted against him. Dkt. 54. For the reasons provided below, the motion (Dkt. 54) should be granted and the claims asserted against him dismissed.

## I.   RELEVANT BACKGROUND FACTS AND PROCEDURAL HISTORY

### A.  RELEVANT BACKGROUND FACTS

Prior to 1992, Plaintiff D'Amico, through Plaintiff SSNW, ran a security services business on the subject property which it leased from a third person who is not a party in this lawsuit. Dkt. 61-1, at 5. The use of the property became the subject of a land use dispute, and a Washington State Court of Appeals Division II decision found that in 1992, when Jefferson County enacted a zoning code, "its provisions for use of the land that SSNW had been leasing for its operations clashed with SSNW's ongoing business, particularly when SSNW expanded its operations to include a paramilitary training base with increased use of its firing ranges and other facilities." *Sec. Servs. Nw., Inc. v. Jefferson Cty.*, 156 Wn. App. 1008 (2010).

By way of background to that litigation, Plaintiff D'Amico states that in 2004, he attempted to apply for a building permit to add a bunkhouse and classroom to the shooting range. Dkt. 61, at 4. He asserts that his application was refused, but that he built the buildings anyway in the spring of 2005. *Id.* The Plaintiff maintains that a group of property owners across Discovery Bay from the shooting range, formed a group called "Discovery Bay Alliance," and made several noise complaints about the activities on the property. *Id.* In July and August of 2005, Defendant Jefferson County issued stop work orders. *Id.* Plaintiff D'Amico and the County then engaged in lengthy state court and administrative proceedings, which included at least two decisions from the Washington State Court of Appeals Division II. *Security Services*

1   *Northwest Inc., v. Jefferson County*, 144 Wn.App. 1002 (2008) and *Sec. Servs. Nw., Inc. v.*

2   *Jefferson Cty.*, 156 Wn. App. 1008 (2010).  This case is intertwined with these prior proceedings,

3   and so the procedural history of those matters will be recounted here as provided in the 2010

4   Washington State Court of Appeals Division II decision *Sec. Servs. Nw., Inc. v. Jefferson Cty.*,

5   156 Wn. App. 1008 (2010):

> In 2005 Jefferson County issued stop work orders to [SSNW] after receiving
> several noise complaints and learning that SSNW had constructed several
> unpermitted buildings and was conducting military special forces weapons
> training on its property, which at the time was zoned as rural residential. SSNW
> appealed the County's enforcement orders to the County's hearing examiner,
> arguing that its activities were protected as a nonconforming use.
>
> The hearing examiner disagreed, ruling that SSNW had no legal prior
> nonconforming use rights as of January 6, 1992, because SSNW had violated the
> building code when it constructed three new buildings without the required
> permits. While awaiting the hearing examiner's ruling, the Jefferson County
> Superior Court granted the County's request for a temporary restraining order as
> well as preliminary injunction against SSNW.
>
> SSNW filed a [Land Use Petition Act] appeal in Kitsap County Superior Court,
> asserting that the hearing examiner had erred in finding no prior legal
> nonconforming uses. The superior court ruled that (1) the County's land use
> enforcement actions were valid; (2) the hearing examiner had erred in denying
> that SSNW had established any legal prior nonconforming use; and (3) by 1992,
> SSNW had established a limited nonconforming use by virtue of its predecessor's
> security services on the site. The superior court also ruled, however, that most of
> the challenges raised by SSNW are without merit. The superior court affirmed (1)
> the hearing examiner's decision to uphold the County's stop work orders,
> concluding that the hearing examiner did not err in finding that the stop work
> orders were properly issued by the County, and that proper procedure was
> followed by the County in its enforcement actions, and (2) the hearing examiner's
> ruling that SSNW had no legal nonconforming rights to use the property for its
> post–1992 expanded security services business.  In essence, the superior court
> found that the County's land use enforcement actions related only to SSNW's
> clearly illegal post–1992 activities, especially the erection of buildings without
> permits and on-site training of third parties.
>
> The superior court remanded for another hearing to determine the scope of
> SSNW's nonconforming use as of January 6, 1992, when the County enacted the
> zoning code that rendered SSNW's later uses illegal. The purpose of this hearing
> was to establish the use which may be made of the property by SSNW following
> the Examiner's modified decision.  In the meantime, the superior court ordered

that the temporary restraining order and the preliminary injunction would remain in effect pending the Hearing Examiner's final decision. SSNW appealed.

Affirming the superior court on appeal, [Washington Court of Appeals Division II] similarly reversed the hearing examiner's decision that SSNW had no legal prior nonconforming use rights as of January 6, 1992 . . . [and] affirmed the superior court's ruling that SSNW had limited nonconforming use rights as of January 6, 1992, which were properly limited to its pre–1992 activities. [It] held that (1) neither the hearing examiner nor the superior court erred in concluding that SSNW's current activities constituted an impermissible expansion of its pre–1992 uses and (2) SSNW has not lost any vested property right. [It] also noted, however, that the record was insufficient to show SSNW's activities as of 1992 and its subsequent potentially legal intensification of those previously existing activities. Expanding the scope of the trial court's remand order, [it] remanded for a new hearing to determine the boundaries of SSNW's nonconforming use rights and to consider additional evidence on intensification of pre–1992 uses.

On remand, the parties stipulated that SSNW's pre–1992 security services business included the following components as of January 6, 1992: armed and unarmed site security; armed and unarmed armored car security; armed and unarmed K–9 detection and tracking; security alarm installation, monitoring, and security response; dispatching services, including armed and unarmed security guards; security service training for employees; armed and unarmed land patrol; and armed and unarmed maritime patrol. The parties also stipulated that these pre–1992 security services activities used the old Gunstone farm house for offices, a conference room, and living accommodations but that three new buildings SSNW erected without permits in 2005 to provide new accommodations were not preexisting nonconforming uses.

On July 27, 2009, a new hearing examiner ruled on remand that SSNW's pre–1992 nonconforming uses consisted of armed and unarmed site security . . . and alarm installation and monitoring. The hearing examiner also ruled that since 1992, SSNW had lawfully intensified the following prior nonconforming uses: unlimited increase in the number of off-site employees . . . and use of a dock for marine security training.

The hearing examiner further concluded that the following were either unlawful post–1992 expansions or uses that had not occurred before 1992: more than 18 armed and unarmed security personnel working on or from the site and needing weapons training; third-party use of or training at the shooting ranges; and use of helicopters for training or surveillance.

*Sec. Servs. Nw., Inc. v. Jefferson Cty.*, 156 Wn. App. 1008 (2010).

1    According to the Plaintiff, after five years of expensive litigation, Defendant Jefferson

2    County did not attempt to shut his gun range down again for several years and so, he continued

3    operations.  Dkt. 61, at 5.

4    In November of 2014, Defendant David Stanko was elected as Jefferson County Sheriff

5    for his first term.  Dkt. 61.  He served as sheriff for a four-year term.  *Id.*

6    In 2015, Defendant Jefferson County passed a Noise Control Ordinance.  Jefferson

7    County Code ("JJC") 8.70.  Enforcement of the Noise Control Ordinance "is the responsibility of

8    the Jefferson County Sheriff," JCC 8.70.303, and penalties escalate: a warning is to be issued

9    first, then a civil infraction, and then if there is no compliance, a criminal charge can be filed

10   with the possibility of a fine or 90 days in jail, JCC 8.70.70(1)(a)-(c).  A "lawful discharge of

11   firearms" is not considered a violation of the ordinance.  JCC 8.70.060(18).

12   Plaintiff D'Amico points to various emails he states that he acquired from a public

13   records request that show that Sheriff Stanko was receiving emails from people in the

14   community complaining about noise out at Fort Discovery.  Dkt. 61.  Plaintiff D'Amico points

15   out that Sheriff Stanko had to run for re-election in 2018.  *Id.*

16   According to Joseph Nole, Jefferson County's undersheriff at the time, in January 2017, a

17   group of people came to the department to see the Sheriff and discuss the activities going on out

18   at Fort Discovery.  Dkt. 62-1, at 27.  (Undersheriff Nole was elected as sheriff in November of

19   2018, beating Sheriff Stanko; Nole is the current sheriff).  *Id.*  Undersheriff Nole states that he got

20   "pulled" into the meeting.  *Id.*  He states the visitors gave him copies of 2009 and 2010 court

21   orders related to SSNW and discussed their theory that there are people shooting illegally out on

22   the Fort Discovery property (because of the 2009 and 2010 court orders limiting who can shoot

23   out there) and so the noise ordinance was being broken.  *Id.* at 27-28.  Intrigued by the idea,

24   Undersheriff Nole states that he conferred with Michael Hass, the Jefferson County Prosecuting

Attorney, and David Alvarez, the chief civil attorney, and asserts they told him "they wouldn't do anything" even if he came up with anything to send them. *Id.*, at 28. Feeling it was "kind of a civil matter," he told Sheriff Stanko that he didn't think it was something they should get involved with – that it might lead to litigation. *Id.* Nole states that prior to Sheriff Stanko's tenure, the department had a policy of not responding to complaints of noise coming from Fort Discovery. Dkt. 62-1, at 30. According to Nole, the complaints were recorded but the department took no action on them. *Id.* He states that he does not know why prior sheriffs did not act on the noise complaints regarding Fort Discovery. *Id.*

Soon after undersheriff Nole indicated that he did not think they should get involved, sometime in late January 2017, Sheriff Stanko assigned Defendant Gebo (the moving party here) to investigate who was using the facilities at Fort Discovery. Dkt. 62-1, at 6. (In January 2017 to April 2017, Defendant Gebo, who was retired from the Seattle Police Department, was a paid part-time special investigator for the Jefferson County Sheriff's Department. Dkt. 62-1, at 3-4. After he realized he couldn't continue to be paid for that position as well as being a Jefferson County Civil Service Commissioner, he continued on with the department as a volunteer. *Id.*) In any event, Defendant Gebo states that Sheriff Stanko gave him copies of 2009 and 2010 court orders relating to SSNW and told him to investigate whether "any of those things that . . . Fort Discovery was not supposed to be doing were actually happening." *Id.* Sheriff Stanko also gave Gebo a printout purportedly from Fort Discovery's website listing "satisfied customers." Dkt. 55, at 3.

Defendant Gebo states that he began contacting, by phone and by email, the U.S. Coast Guard, the Federal Bureau of Investigation, the U.S. Customs & Border Protection, the Washington State Patrol, the Kitsap County Sheriff's Office, and the Clallam County Sheriff's

Office, "to see if they used the facilities out at Fort Discovery," and if so, how they used the facilities.  Dkt. 62-1, at 4-5.

For example, on March 14, 2017, Defendant Gebo emailed the Captain Chris Old at the Washington State Patrol:

> Captain Old – Sheriff Stanko suggested I contact you regarding your knowledge of WSP's involvement in range training, SWAT and sniper training, bomb disposal and post-blast investigation training that may have occurred on property known as "Fort Discovery" in Jefferson County since 2009.
> By way of explanation [SSNW] is owned and operated by Mr. Joe D'Amico providing private security services as well as a large range area which has been used by local and federal police agencies for firearms, SWAT, sniper and related training.  The range and related structures are known as "Fort Discovery."
> In 2009 a court order was issued strictly limiting the range and related operations and disallowing any "third party" training at the facility.  It is alleged that the court order has been largely ignored through the years as agencies and groups of agencies have used the facility for live fire range training, sniper training, helicopter operations, and other related operational training.
> We are interested in determining if any members of the Washington State Patrol, in groups or individually, have been involved in any training operations at Fort Discovery since 2009.  It is quite likely that the attendees and their agencies had no knowledge of the preexisting court order.

Dkt. 61-1, at 38.  In an email a few days later with another person at the Washington State Patrol, Gebo acknowledges that, "[f]or a variety of reasons these alleged violations of the prior court order have been largely ignored by law enforcement and the Jefferson County Prosecutor's Office even though the owners of neighboring properties have repeatedly reported and complained.  That situation has recently changed." *Id.*, at 39.

By way of further example, on March 20, 2017, Gebo emailed the United States Coast Guard:

> Lt. Comdr. Bor – I hope I am addressing this request for information to the proper place.
> The Jefferson County Sheriff's Office and the Jefferson County Prosecuting Attorney's Office are interested in knowing specific dates and times number of USCG personnel types of weapons and amount of ammo fired fees paid and copies of contracts related to the Coast Guard using a range and training

facility known as "Fort Discovery" in Jefferson County Washington since 2009. This request for information should be considered an official request for information under the Freedom of Information Act.

By way of background, in 2009, Jefferson County filed a lawsuit against [SSNW] the owners and operators of Fort Discovery alleging the operation violated several building and land use codes. A lengthy court battle ensued with the case being heard by the Washington State Court of Appeals which remanded the case back to the county. The result of the court action was an order directing SSNW to roll their activities back to the level they were involved in in 1992 and that no "third party training" should occur at Fort Discovery.

Since that time SSNW has largely ignored the existence of this court order as large numbers of local state and federal agencies have used the range and related facilities for training and weapons qualification. For a variety of reasons repeated complaints and reports by concerned neighbors and citizens were also largely ignored. That situation has recently changed.

The matter is likely headed for additional hearings in court. It is widely accepted the agencies using the facilities at Fort Discovery were not aware of the 2009 court order. There is no date set for any court hearing(s) but your prompt response is appreciated. If you should have any questions regarding this request for information please contact me.

*Id.,* at 41. Gebo sent a similar email to the Kitsap County Sheriff's Office (Dkt. 61-1, at 42) and the Department of Homeland Security (Dkt. 61-1, at 53).

According to Gebo, several of the witnesses he contacted asked him "if their agency/organization should continue to use the range facilities at Fort Discovery. In each of those inquiries [his] answer was that the situation was likely headed for additional court hearings and that they should make their own decision as to what they, or their agency, should do." Dkt. 55, at 4.

Plaintiff D'Amico states that he had a Facebook news page and that he criticized Sheriff Stanko on it. Dkt. 61, at 3. He asserts that on March 2, 2017, he posted on Facebook about his view that Sheriff Stanko was responsible for a death in the jail. *Id.*

Over the next several months, through his investigation, Gebo learned that several agencies had paid to use Fort Discovery's gun ranges after 2009 and 2010. Dkt. 55, at 3. On June 26, 2017, Sheriff Stanko emailed Gebo and asked him to tell CORPES, a retired law

1    enforcement group of which Gebo was a member, that Sheriff Stanko did not "endorse nor

2    support any [weapons] qualifying at Fort Discovery until court order is complied with in full.

3    Please tell them no qualifying at Fort Discovery."  Dkt. 61-1, at 26.

4        Defendant Gebo met with Phil Hunsucker, a Jefferson County prosecutor, regarding the

5    status of his investigation of Fort Discovery.  Dkt. 62-1, at 11.  On August 31, 2017, Gebo

6    received an email from Sheriff Stanko that states that "Phil Hunsucker would like us to carry the

7    investigation one step further . . . could you inquire with the Revenue folks."  Dkt. 61-1, at 51.

8    Gebo contacted the Washington Department of Revenue about Fort Discovery particularly after

9    noticing that one of the receipts sent to him by "Valley Swat" for services out at Fort Discovery

10   did not include any tax charges.  Dkts. 55, at 5; and 61-1, at 17.  Further, Gebo states that he was

11   asked by the Jefferson County Prosecutor's Office to investigate whether those who used Fort

12   Discovery were also being served meals for possible health code violations.  Dkt. 62-1, at 13.

13   Under Washington Administrative Code 246-215-08600(1), it is a misdemeanor to operate a food

14   establishment without a permit.  Jefferson County has incorporated the Washington Department of

15   Health's Food Services Code. JCC 8.05.020.

16       Gebo states that he did not make the charging decisions; he conducted the investigation

17   and turned the information he found over to the prosecutor.  Dkt. 55, at 4-5.  He also states he did

18   not take any enforcement action, seek a search warrant, or arrest anyone.  *Id.*

19       According to Plaintiff D'Amico, Gebo's contacts with his customers "drove them off."

20   Dkt. 61, at 14.  By way of example, he points to a May 17, 2017 email from the U.S. Coast

21   Guard indicating that it would not use his facility until the legal issues are resolved.  *Id.*  Plaintiff

22   D'Amico states that the following customers of the facility from 2000-2016 never returned:

23   divisions of the U.S. Coast Guard, divisions of the U.S. Customs and Border Protection,

24   divisions of the U.S. Department of Homeland Security, "Valley Swat," and Washington State

1  Parks Police.  *Id.*  According to the Second Amended Complaint, the Plaintiffs' landlord evicted
2  them in September of 2017.  Dkt. 37, at 10.

3          The Second Amended Complaint makes claims against Defendant Gebo for violations of
4  Washington's Consumer Protection Act, RCW 19.86, *et. seq*., tortious interference with a
5  business expectancy, and for civil conspiracy.  Dkt. 37.

6      **B.  PROCEDURAL HISTORY**

7          On June 4, 2020, Defendants Jefferson County Board of Commissioners Kathleen Kler,
8  David Sullivan, Kate Dean, and Greg Brotherton moved for summary judgment dismissal of the
9  42 U.S.C. § 1983 claims asserted against them, arguing that they were entitled to absolute
10  immunity from a suit brought against under 42 U.S.C. § 1983 for their legislative activities.  Dkt.
11  19.  Their motion was granted and those parties, except Defendant Kler, were dismissed.  Dkt.
12  36.  The parties stipulated to the dismissal of the additional claims made against Defendant Kler
13  and she was dismissed.  Dkt. 50.

14          Defendant Gebo now moves for summary judgment dismissal of all claims made against
15  him.  Dkt. 54.  The Plaintiffs respond and oppose the motion.  Dkt. 60.  Defendant Gebo has
16  replied and moves to strike portions of the Plaintiffs response.  Dkt. 67.  The motions are ripe for
17  consideration.  This opinion will first consider Defendant Gebo's motion to strike (Dkt. 67) and
18  then his motion for summary judgment (Dkt. 54).

19                          II.  **<u>DISCUSSION</u>**

20      **A.  MOTION TO STRIKE**

21          Defendant Gebo moves to strike portions of the Plaintiffs' response which points to evidence
22  that is either not in the record or does not support Plaintiffs' contentions.  Dkt. 67.

23          The motion to strike should be denied without prejudice.  While the Court recognizes that
24  some of the Plaintiffs' claims are not supported by the citation to the record they provide or is

ORDER ON DEFENDANT ROBERT GEBO'S MOTION FOR SUMMARY JUDGMENT - 10

not in the record, a motion to strike is not necessary.  The Court is able to separate fact from supposition.

**B.  SUMMARY JUDGMENT STANDARD**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt.").  *See also* Fed. R. Civ. P. 56 (d).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question.  The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party.  The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

1   to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

2   Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not

3   be "presumed."  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

4   **C.  CLAIM UNDER WASHINGTON'S CPA**

5          Washington's CPA was enacted to protect the public from "unfair or deceptive acts or

6   practices in the conduct of any trade or commerce."  *Indoor Billboard/Washington, Inc. v.*

7   *Integra Telecom of Washington, Inc*., 162 Wn.2d 59, 73, 170 P.3d 10, 17 (2007)(*quoting* RCW

8   19.86.020).  To make a CPA claim, "a plaintiff must establish five distinct elements: (1) unfair or

9   deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4)

10  injury to plaintiff in his or her business or property; (5) causation." *Hangman Ridge Training*

11  *Stables, Inc. v. Safeco Title Ins. Co*., 105 Wash.2d 778, 780 (1986); *Keodalah v. Allstate*

12  *Insurance Co.,* 194 Wash.2d 349, 349-350 (2019).

13         The Plaintiffs' claims against Defendant Gebo for violations of the CPA should be

14  dismissed.  The Plaintiffs have failed to point to issues of fact on the first and second elements,

15  that Defendant Gebo engaged in a "deceptive act or practice occurring in trade or commerce."

16  Defendant Gebo was investigating potential violations of the county code.  The Plaintiffs have

17  failed to demonstrate that Defendant Gebo's emails or phone calls were deceptive.  While he

18  appears to commit scrivener's errors in his emails occasionally, pointing to a 1992 court order

19  rather than the 2009 hearing examiner's decision, for example, and indicates that hearings may

20  occur, the Plaintiffs fail to show that these were deceptive statements.

21         Defendant Gebo's motion for summary judgment dismissal of the CPA claim (Dkt. 54)

22  should be granted.  This claim should be dismissed.

23

24

## D.  CLAIM FOR TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY

In order to make a claim for tortious interference with a contractual relationship or business expectancy, a Washington plaintiff must prove five elements:

> (1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage.

*Pac. Nw. Shooting Park Ass'n v. City of Sequim*, 158 Wn.2d 342, 350 (2006).

The claim for tortious interference with a business expectancy asserted against Defendant Gebo should be dismissed.  The Plaintiffs have failed to point to issues of fact on the fourth element, that he "interfered for an improper purpose or used improper means."  *Pac. Nw. Shooting Park,* at 350.  The Plaintiffs assert that Defendant Gebo "induced the breach of Fort Discovery's contracts for political purposes."  Dkt. 60.  The Plaintiffs then go on to discuss political pressure, that in the Plaintiffs' view, Sheriff Stanko was operating under.  There is no evidence that Gebo was motivated by a political purpose.

The Plaintiffs argue that the Jefferson County Sheriff's Office does not enforce building or land use code violations and so maintain that this was an improper investigation.  The Plaintiffs fail to acknowledge that this was not a building or land use code violation investigation.  Under Washington law, county sheriff's and their deputies enforce the laws of their counties and investigate potential violations of the law.  RCW 36.28.010, 38.28.011, and 36.28.020.  The Plaintiffs' fail to acknowledge that the sheriff and his appointed representative, Defendant Gebo, had jurisdiction to investigate potential criminal violations of the noise ordinance, health codes, or tax laws.  The noise ordinance excluded <u>legal</u> discharges of firearms; conversely, the illegal discharge of firearms was covered by the noise ordinance.  Despite the Plaintiffs' expert's assertion that the investigation was a fishing expedition, the Plaintiffs fail to

1   point to any evidence that Gebo's investigating was done for an improper purpose. Likewise,

2   their contention, that Gebo's use of county resources to contact Fort Discovery's customers was

3   improper because the investigation was inappropriate, fails. The Plaintiffs have failed to point to

4   evidence that Gebo's investigation was for an improper purpose or by improper means,

5   accordingly, they have failed to show that his use of county resources to conduct the

6   investigation was tortious.

7        Defendant Gebo's motion for summary judgment dismissal of the tortious interference

8   with a business expectancy claim (Dkt. 54) should be granted. This claim should be dismissed

9   with prejudice.

10  **E. CLAIM FOR CIVIL CONSPIRACY**

11       Under Washington law, "[a] conspiracy is a combination of two or more persons who

12  contrive to commit a criminal or unlawful act, or to commit a lawful act for criminal or unlawful

13  purposes." *Adams v. King County*, 164 Wash.2d 640, 660 (2008)(*internal citation omitted*). For

14  there to be a conspiracy, Plaintiff must allege that the Defendants "entered into an agreement of

15  some kind with the other conspirators to accomplish the object of the conspiracy." *John Davis &*

16  *Co. v. Cedar Glen # Four, Inc.*, 75 Wash.2d 214, 223, (1969).

17       The Plaintiffs claim for civil conspiracy against Defendant Gebo should be dismissed.

18  The Plaintiffs have failed to point to issues of material fact that supports the existence of an

19  agreement that Defendant Gebo and another entered into "to commit a criminal or unlawful act,"

20  or to "commit a lawful act for criminal or unlawful purposes." *Adams,* at 660. Defendant Gebo

21  was investigating possible violations of the county noise ordinance, tax laws and health codes at

22  the direction of the Sheriff and county prosecutor.

23       Defendant Gebo's motion for summary judgment dismissal of the civil conspiracy claim

24  (Dkt. 54) should be granted. This claim should be dismissed with prejudice.

ORDER ON DEFENDANT ROBERT GEBO'S MOTION FOR SUMMARY JUDGMENT - 14

**F.  CONCLUSION**

Defendant Gebo's motion should be granted (Dkt. 54) and all claims asserted against him should be dismissed.  The Court need not reach Defendant Gebo's remaining arguments for dismissal.

**III.  ORDER**

Therefore, it is hereby **ORDERED** that:

- Defendant Robert Gebo's motion to strike (Dkt. 67) **IS DENIED WITHOUT PREJUDICE**;

- Defendant Robert Gebo's Motion for Summary Judgment (Dkt. 54) **IS GRANTED**; and

- The claims asserted against Defendant Robert Gebo **ARE DISMISSED WITH PREJUDICE**.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

Dated this 1st day of February, 2021.

ROBERT J. BRYAN
United States District Judge